IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Maryann Barmore, as Special Administrator for the Estate of Mark A. Barmore, <br><br>  Plaintiff, <br><br> vs. <br><br> City of Rockford, et al., <br><br>  Defendants. | ) <br> ) <br> ) Case No. 09 C 50236 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Judge Philip G. Reinhard <br> ) <br> ) |

## ORDER

      For the reasons stated below, all defendants' motions for summary judgment are denied. The court did not consider the opinions of Andrew Scott, Independent Assessment and Monitoring or Michael Graham in deciding the motion for summary judgment. Defendants' motion [246] to exclude these opinions is denied as moot. Plaintiff's motion to strike certain defense affidavits [232] is denied. Plaintiff's motion to supplement her LR56.1 additional facts [241] is denied. Plaintiff's motion to supplement the record [251] with a copy of a state appellate court order is denied. Defendant Poole's motion [279] to join Defendant North's motion to supplement the record [277] is granted. The motion [277] to supplement defendants' joint rule 56.1 statement of material facts to reflect the findings of the United States Department of Justice, Civil Rights Division is denied as those findings are irrelevant to the determination of the summary judgment motion.

## STATEMENT - OPINION

      Plaintiff, Maryann Barmore, special administrator of the Estate of Mark A. Barmore ("Barmore"), deceased, brought this action in state court against defendants, City of Rockford ("City"), and two of the City's police officers, Stanton North and Oda Poole. North and Poole shot decedent in the course of attempting to apprehend him and he died as a result of this shooting. Plaintiff alleges federal claims for excessive force and state claims for wrongful death against all defendants. Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. Tennessee v. Garner, 471 U.S. 1, 7 (1985). Defendants removed to this court based on plaintiff's Fourth Amendment excessive

force claim. Jurisdiction is proper. 42 U.S.C. § 1983; 28 U.S.C. § 1367(a). The individual defendants each move for summary judgment.[1]

On August 24, 2009, the police were looking for Barmore in connection with an altercation with a woman that involved a knife. An existing arrest warrant for Barmore had a caution on it that he was to be considered armed and dangerous. At approximately 12:15 p.m., North and Poole were assigned to look for him. Shortly thereafter, they spotted him in front of the Kingdom Authority International Ministries Church ("Church") as they were driving past. They turned their squadrol van around and returned to where they had seen him. Barmore had been talking to some people on the street in front of the church when the officers went past. Before the officers returned, Barmore ran into the Church. While the Church doors were normally locked, Barmore was able to enter by catching a door before it closed behind Sheila Brown ("Sheila") and Marissa Brown ("Marissa"). The Church also housed a daycare center where Sheila and Marissa worked. Sheila immediately asked Barmore what he was doing and told him he could not be in there. Poole approached the Church, Sheila let him in, and he followed Barmore down a hallway. A child in the hallway told Poole Barmore had gone downstairs. Sheila then said the children were down there. North arrived in the building and he and Poole descended the stairs to the basement. Sheila and Marissa also went downstairs.

In the basement, one of the children indicated to the officers that Barmore had gone into the boiler room. The boiler room door was inside the daycare room in the basement. Poole and North entered the daycare room and Marissa stepped inside the room behind them. The officers kicked the boiler room door and it opened a bit. They repeatedly ordered Barmore to come out of the boiler room. Marissa saw Barmore exit the boiler room with his hands up and his head down. She never saw Barmore grab an officer's gun. She did not see any weapon or object in his hands. Marissa testified in her deposition that Barmore came out about a step beyond the boiler room door with his hands up when the first shot was fired. Barmore fell against a sink then pushed himself back up. His hands were still up. Another shot was fired and then another shot was fired but at this point Barmore was no longer standing.

Alex Hunter testified in his deposition that he was standing beside Marissa looking at the officers as they were pointing their guns at the boiler room door. He was able to observe both officers and their guns up until the firing of the first shot.[2] He did not see Barmore grab an officer's gun or observe a struggle.

---

[1] The City does not file any briefs or raise any arguments in its own defense but adopts the briefs and arguments of North and Poole. Therefore, the City's fate on summary judgment is tied exclusively to the fates of North and Poole.

[2] Hunter testified that he could see the officers and their guns all the way up to the firing of the first shot and that he never saw anyone grab Poole's gun or see Poole struggle with anyone. However, he also later answered "No" to the question: "If someone grabbed the gun prior to the first gunshot being fired, you were in a position to see that, correct?"

2

Defendants' version of the facts of the shooting are much different from the version told by Marissa Brown and Alex Hunter. North testified Barmore exited the boiler room and lunged at Poole grabbing the barrel of Poole's firearm first with his left hand, then with both hands. Poole's gun was pushed back toward Poole's face. Poole was able to redirect the gun back toward Barmore's head/neck area at which time North heard the weapon discharge. Poole and Barmore were both still standing at this time.

Poole testified Barmore grabbed the barrel of Poole's handgun and pushed the firearm in Poole's direction. Poole pushed the weapon back into a position where he believed the round would strike Barmore and pulled the trigger. The round struck Barmore in the neck. They continued to struggle for the weapon and North then fired several times. Poole testified that as the rounds began to take effect on Barmore, Poole was able to pull his gun away from Barmore, who then fell to the floor.

"[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Garner, 471 U.S. at 7. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others it is not constitutionally unreasonable" for the officer to use deadly force to apprehend the suspect. Id. at 11. However, "shooting a disarmed and passive suspect is a clear example of excessive force in violation of the fourth amendment." Dye v. Wargo, 253 F.3d 296, 298 (7th Cir. 2001).

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. Schepers v. Commissioner, Indiana Dept. of Corrections, 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witnesses' testimony. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The above recited facts show there is a dispute as to a material fact. The evidence is conflicting. Did Barmore grab Poole's weapon (thus posing a threat of serious physical harm to the officers) and get shot during the struggle for it? Or, did he, in compliance with the officers' commands, walk out of the boiler room, with his hands up (an unarmed passive suspect), and get shot by the officers while he was standing there in a hands-up position? Defendants acknowledge this dispute but contend it is not a genuine dispute because plaintiff's evidence is blatantly contradicted by undisputed physical and forensic evidence and plaintiff's witnesses' testimony is contradicted by their own prior statements and by each other's testimony.

Whether the deposition testimony of a witness conflicts with the statement given by that witness to police after the incident and whether a witness's account of an event differs from another witness's account goes to the credibility of the witness. These are matters to be probed on cross examination and by impeachment evidence at trial. The court cannot weigh this

3

evidence or assess the credibility of these witnesses at the summary judgment stage. O'Leary, 657 F.3d at 630.

Defendants also argue that the physical and forensic evidence blatantly contradict the deposition testimony offered by plaintiff to support the excessive force claim. Defendants contend Scott v. Harris, 550 U.S. 372 (2007) entitles them to summary judgment. The Supreme Court stated in Scott that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 380. In Scott, the parties told two different stories concerning "whether [the plaintiff] was driving in such a fashion as to endanger human life." Id. The plaintiff maintained his driving posed no such danger while defendant maintained the plaintiff's driving did pose such a danger. The record contained a videotape of the driving in question which showed the plaintiff's "vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast." Id. at 379. The videotape showed the plaintiff's car "swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit." Id. In light of this, "[the plaintiff's] version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such a visible fiction; it should have viewed the facts in the light depicted by the videotape." Id. at 380-81.

No videotape of Barmore's shooting exists to show the accounts of plaintiff's eyewitnesses are a "visible fiction." Instead, defendants contend the physical and forensic evidence here are to the same effect as the Scott videotape in rendering the eyewitness accounts beyond belief. According to defendants, that evidence shows Barmore was shot once in the neck at close range (12 to 24 inches) with the shot entering from the front to the back and angling upward. Barmore's DNA was recovered from the slide and ejection port of Poole's firearm, one spent casing was discovered in the chamber of Poole's weapon (meaning it did not eject after firing), and there was a DNA profile recovered under Barmore's left fingernail clipping from which Poole could not be excluded as a match but North and Barmore could be excluded. All three gunshot wounds to Barmore's back were entrance wounds, the autopsy revealed no evidence of close range fire surrounding the three wounds in the back. Two of the back wounds tracked back to front and upward and the third tracked back to front and left to right. These wounds were consistent with Barmore having been shot from behind while bending over at the waist.

Does this evidence so utterly discredit plaintiff's eyewitnesses testimony that no reasonable jury could believe the eyewitnesses? Put another way, are the eyewitnesses incredible as a matter of law? If not, their testimony is sufficient to create a genuine dispute of a material fact. See United States v. Funds in the Amount of One Hundred Thousand One Hundred and Twenty Dollars, No. 11-3706, 2013 WL 5273301, *5 (7th Cir. Sept. 19, 2013).

4

To be incredible as a matter of law, the witnesses' testimony must be unbelievable on its face. "[I]t must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." Id. at n. 8 (quoting United States v. Dunigan, 884 F.2d 1010, 1013 (7th Cir. 1989).) In Scott, the videotape belied the plaintiff's version of the events. The videotape clearly showed what happened and that what the plaintiff said happened did not. That sort of clarity is lacking from defendants' evidence here.

Marissa Brown testified she saw Barmore walk out of the boiler room with his hands up and get shot. She testified she saw no struggle for Poole's weapon. Alex Hunter also testified he could see the officers' guns up until the time the first shot was fired and that no one grabbed an officers' gun. It was not physically impossible for Marissa and Hunter to see what they claim to have seen nor was it impossible under the laws of nature for the occurrence to have taken place. Defendants argue the physical and forensic evidence shows none of the shots to Barmore's back could have been sustained while he was standing facing the officers or while lying on the floor. Marissa testified that the second shot was fired after Barmore pushed himself back up from the sink he had fallen on after the first shot (this would have him still facing the officers) and that another shot was fired but at this point he was no longer standing. Defendants can certainly use this evidence to challenge the credibility of Marissa's testimony at trial. But whether Barmore was standing facing the officers, lying on the floor, or bent over at the waist (as defendants' evidence suggests) does not control whether he was subjected to excessive force. Marissa was in a high stress situation observing the use of deadly force by the officers. She may well have gotten the details wrong. The stress, particularly once the shooting commenced, could certainly have affected her perception. She may well not be remembering the position of Barmore and the officers during the incident accurately. She may not be remembering any of it accurately. Her testimony is certainly fair game at trial. But, for purposes of summary judgment, she testified she saw Barmore shot with his hands up (from which it can be inferred he was attempting to surrender) and shot again and again while offering no resistance and it is not impossible that this occurred.

Defendants contend that the presence of Barmore's DNA on the slide and ejection port of Poole's weapon proves Barmore had his hand on Poole's gun, thus disproving the testimony there was no struggle. This is pretty strong evidence in defendants' favor. However, to defeat summary judgment, plaintiff does not have to prove her evidence is more believable than defendants' evidence. She only has to offer evidence which, if believed, would support a verdict in her favor, Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008). Whether defendants' evidence that Barmore's DNA was on Poole's weapon, and the inferences that can be drawn from it, outweighs the eyewitness testimony, is for the trier of fact to determine. On summary judgment, "a court may not weigh the evidence, or decide which inferences to draw from the facts. The temptation is often difficult to resist in cases where the facts and inferences appear to lead more strongly to one conclusion than another. On summary judgment, however, the court has one task and one task only; to decide, based on the evidence of record, whether there is a material dispute of fact that requires a trial." Kodish v. Oakbrook Terrace Fire Protection Dist.,

604 F.3d 490, 507 (7th Cir. 2010) (internal quotation marks and citations omitted). While defendants' evidence is substantial, to rule in defendants' favor would require the drawing of inferences in defendants' favor, which cannot be done at the summary judgment stage. Unlike the videotape in Scott, defendants' evidence, without the drawing of inferences, does not so utterly discredit the eyewitness testimony that a reasonable jury could not believe that testimony.[3]

      For the foregoing reasons, all defendants' motions for summary judgment are denied. The court did not consider the opinions of Andrew Scott, Independent Assessment and Monitoring or Michael Graham in deciding the motion for summary judgment. Defendants' motion [246] to exclude these opinions is denied as moot. Plaintiff's motion to strike certain defense affidavits [232] is denied. Plaintiff's motion to supplement her LR56.1 additional facts [241] is denied. Plaintiff's motion to supplement the record [251] with a copy of a state appellate court order is denied. Defendant Poole's motion [279] to join Defendant North's motion to supplement the record [277] is granted. The motion [277] to supplement defendants' joint rule 56.1 statement of material facts to reflect the findings of the United States Department of Justice, Civil Rights Division is denied as those findings are irrelevant to the determination of the summary judgment motion.

Date: 10/02/2013                                                                         ENTER:

                                                                                             *Philip G. Reinhard*

                                                              United States District Court Judge

                                                                                                                                              Electronic Notices.
                                                                                                                                              (LC)

---

[3] Because "shooting a disarmed and passive suspect is a clear example of excessive force in violation of the fourth amendment," Dye v. Wargo, 253 F.3d 296, 298 (7th Cir. 2001), which would have been known to the officers at the time of Barmore's shooting in 2009, qualified immunity is not a basis for summary judgment in defendants' favor, as a genuine dispute exists as to whether Barmore was shot with his hands raised in a posture of surrender or during the course of a struggle for Poole's weapon.

6